**The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below. This document was signed electronically at the time and date indicated, which may be materially different from its entry on the record.**



Russ Kendig
United States Bankruptcy Judge

Dated: 11:56 AM July 5, 2018

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 13 |
| | ) | |
| CHRISTOPHER ADAM NACCI | ) | CASE NO. 15-61536 |
| AND ELIZABETH ANN NACCI, | ) | |
| | ) | JUDGE RUSS KENDIG |
| Debtors. | ) | |
| | ) | |
| | ) | **MEMORANDUM OF OPINION** |
| | ) | |

   Chapter 13 debtors Christopher Adam Nacci and Elizabeth Ann Nacci moved the court for authority to borrow money, specifically to incur student loan debt on behalf of their daughter. Toby L. Rosen, the chapter 13 trustee ("Trustee"), objected to the motion. The court held a hearing on June 6, 2018. Thomas K. Mast, attorney for Debtors, and Trustee participated in the hearing. Debtors filed a post-hearing brief on June 11, 2018 and the court took the matter under advisement. The court convened an additional telephonic status conference on June 26, 2018. Mr. Mast and Robert Harbert, counsel for Trustee, participated in the conference.

   The court has subject matter jurisdiction of this case under 28 U.S.C. § 1334 and the general order of reference entered by The United States District Court for the Northern District of Ohio on April 4, 2012. Gen. Order 2012-7. The court has authority to enter final orders in this matter. Pursuant to 11 U.S.C. § 1409, venue in this court is proper. The following constitutes the court's findings of fact and conclusions of law under Bankruptcy Rule 7052.

1

## FACTS

On July 17, 2015, Debtors filed a chapter 13 petition. Their gross annual income was approximately $118,000, making them above-median debtors. They identified secured debts totaling over $183,000, including a residence and two vehicles. Their residence was underwater, valued at $130,730 with two mortgages totaling $160,443. They were also underwater on a 2013 Chevy Sonic, valued at $8,000 on which they owed in excess of $18,350. The balance of the loan on the second vehicle was roughly equal to its $4393 loan value. Debtors had substantial unsecured debt, around $158,000. Approximately $1,500 was priority tax claims, the balance was primarily credit card debt and payday loans.

They confirmed a plan on December 31, 2015 and are paying Trustee $1,900.00 per month. Although the plan represents unsecured creditors will receive a seventy-two percent (72%) dividend, the parties represented at hearing that Debtors will pay unsecured claims in full over the life of the plan.[1] In March 2017, the court granted them authority to borrow money to purchase a 2013 Chevrolet Cruz. The loan on the Chrysler was paid, leaving them funds for the purchase without altering plan payments.

Debtors are the parents of two daughters, one a recent high school graduate set to enter college this fall ("Daughter"). After several college acceptances, she desires to attend Case Western Reserve University ("CWRU") to possibly study nutritional biochemistry or environmental studies. Debtors introduced the following figures in their post-hearing brief:

**Costs**

| | |
|---|---|
| Tuition | $49,597 |
| Housing & meals | $15,190 |
| | $64,787 |

**Funding sources**

| | |
|---|---|
| COW grant[2] | $36,000 |
| Direct loans to Daughter | 5,500 |
| Campus employment | 2,500 |
| CWRU grant | 5,050 |
| | $49,050 |

**Shortfall**        $15,737

**Direct PLUS loan eligibility**   $18,553

Debtors want to obtain a PLUS loan to cover the shortfall. Debtors represent payments will not

---

1 Although not stated, the increase may result from creditors who failed to file claims.
2 This is a transferable education benefit resulting from Mrs. Nacci's employment with the College of Wooster.

be due until 2020, after chapter 13 plan payments are completed. Debtors anticipate that they will have sufficient funds to make the payments considering they will no longer be paying the $1,900 chapter 13 plan payment when they need to start repayment of the PLUS loan.

## DISCUSSION

Debtors seek to borrow approximately $16,000 to help fund Daughter's first year of college. They contend there will be no impact on the plan or prepetition creditors because loan payments will start in 2020, after their plan is complete. The monthly loan installment will be much less than their $1,900 per month plan payment, leaving them ample funds to make the PLUS loan payment. Trustee opposes the motion to borrow, arguing that it may jeopardize Debtors' fresh start. She questions whether they have explored other, less expensive options, such as attending the College of Wooster and living at home or attending a public university, to avoid the necessity of borrowing money.

There is no provision in the Bankruptcy Code that specifically authorizes an individual chapter 13 debtor to incur postpetition debt. This is probably because the 1978 version of Congress never dreamed debtors would consider huge educational loans for children. While § 364 provides a statutory basis for obtaining unsecured credit and incurring unsecured debt, in chapter 13 cases the authority is granted to a trustee operating a debtor's business under § 1304. Only self-employed debtors engaged in business are entitled to exercise the § 364 powers of a trustee. Debtors are not self-employed and are not operating a business. Consequently, at least one court concluded this left debtors unable to avail themselves of § 364. *See* In re Ward, 546 B.R. 667 (Bankr. N.D. Tex. 2016).

Yet simultaneously, § 1305 creates a pathway for certain postpetition debt to be included in a plan. Id. This provision allows creditors to include postpetition claims for (1) taxes that come due and (2) for consumer debts "that arise[] after the date of the order for relief under this chapter, and that is for property or services necessary for the debtor's performance under the plan" in a plan. 11 U.S.C. § 1305(a)(1) and (2). Where practicable, a debtor must obtain the approval of the trustee. 11 U.S.C. § 1305(c). Plainly, Congress anticipated situations where a debtor incurs postpetition debt. Although there is no provision that authorizes it, § 1305 acquiesces its existence.

The tension between the lack of specific guidance against the reality of postpetition debt creates a mire:

> Postpetition claims are a complex area of Chapter 13 practice. The Code and Bankruptcy Rules do not manage postpetition claims very well. The result is too much uncertainty for debtors and postpetition claim holders, much complicated strategy serving no obvious good purpose and a growing body of case law that is a testament to the lack of clarity in the Code and Rules.

Keith M. Lundin & William H. Brown, Chapter 13 Bankruptcy, 4th Ed., § 302.1, at ¶ 1, Sec. Rev.

3

15-61536-rk    Doc 54    FILED 07/05/18    ENTERED 07/05/18 12:33:15    Page 3 of 7

June 17, 2004, www.chapter13online.com. The result is an ad hoc body of case law on postpetition debt.

Some courts find court approval of postpetition debt is required. The Ward court determined that, at a minimum, the court must be involved in approving postpetition debt in order to review its impact on plan performance and its effect on a debtor's prospects of rehabilitation. Ward, 546 B.R. 667. Other authority suggests § 1305 is limited to what can be *included* in a plan, not what a debtor can *incur*, leaving a debtor free to incur postpetition debt without court involvement. (emphasis added) In re Fields, 551 B.R. 424 (Bankr. D. Minn. 2016); In re Loden, 2017 WL 2829812 (Bankr. W.D. Ark. 2017). At least one court relied on Bankruptcy Rule 4001(c) as a basis for requiring court approval of postpetition debt. Other courts have adopted local rules or orders requiring court authorization of postpetition debt. In re Alomia, 2017 WL 3994811 (Bankr. E.D.N.C. 2017); In re Key, 465 B.R. 709 (Bankr. S.D. Ga. 2012).

This court falls into the latter category. The confirmed plan in this court prohibits debtors from incurring "debt exceeding $500.00 in the aggregate without notice to the Trustee and approval of the Court." (Order Confirming Plan, ECF No. 34). Consequently, this court must approve the PLUS loan sought by Debtors, leading to the next question: What is the appropriate standard to employ in reviewing a chapter 13 debtor's motion to incur postpetition debt? A review of the case law indicates that courts generally take a fact-intensive review of the case, directed at the terms of the postpetition debt, its purpose, the effect on the plan, and the benefit to the debtor. Ward, 546 B.R. 667; Key, 465 B.R. 709; In re Clemons, 358 B.R. 714 (Bankr. W.D. Ky. 2007). Reasonableness and necessity are often key components of the determination.

Ward involved a debtor's motion to borrow money to buy a car. The facts are unparalleled. Debtor had a car when she filed, included in the confirmed, zero percent plan. The creditor's interest rate was reduced from over 20% to 5%. During the plan, Debtor's license was suspended and she did not maintain car insurance as a result, leading to relief from stay and repossession. Several months after losing the car, a local car dealer sent an ad offering to help debtors in bankruptcy purchase a vehicle. She reached a deal with the dealer, paid $500 down, took the car home, and drove it for three months before the motion to obtain the postpetition loan came before the court.

In denying both the motion to borrow and the subsequent motion to reconsider, the court concluded that "the incurrence of the debt, under the described terms and circumstances, was not in the best interests of the Debtor, not reasonable, and not consistent with sound business judgement (sic)," 546 B.R. 667, 672, and the terms of the loan too "onerous and unfavorable" to "find the reasonableness and necessity here that the Bankruptcy Code requires." Id. at 680. The court noted that the proposed loan included add-ons of $2,650 and an annual interest rate of 20.25%. The car was five years old and would not be paid off until it was ten years old. Also, the creditor paid debtor's attorney $500 to file the motion for postpetition financing. The court intimated that the postpetition deal was less favorable than the deal on her original vehicle accomplished through the confirmed plan. Although the court acknowledged that the debtor's life would be easier with a car, the court adjudged the deal too unreasonable to approve.

4

The Key court focused on necessity, considering both the debtor's need and whether it was imperative to successful chapter 13 reorganization. In Key, the debtors sought to borrow money to repair inherited real estate. The court rejected the motion:

> Debtors have not shown the need to take on this additional mortgage while paying their unsecured creditors nothing. Debtors do not reside at this property and it is not necessary for their reorganization. The expenses are significant given the value of the property. There is no prospective tenant and there is a significant likelihood the property will never be habitable. The $338.28/month necessary to service the debt will deplete the sums Debtors have available to fund their chapter 13 plan.

Key, 465 B.R. 709, 713. The court was convinced the loan would have a material impact on plan payments without a corresponding concrete benefit.

A similar analysis of the impact on plan performance was utilized in Clemons. The court stated:
> The purpose behind requiring approval of the Court is to ensure that decisions made by a debtor to obtain credit do not interfere with the debtor's ability to perform under a confirmed chapter 13 plan, and, to the degree possible, to ensure a debtor is not making an imprudent financial decision that could lead the debtor back into bankruptcy.

Clemons, 358 B.R. 714, 716. The court denied the motion without prejudice based on an inadequate factual foundation. Plan performance was also a driving factor in Alomia, where the court denied a debtor's motion to borrow for educational purposes because the debtor was not current on plan payments. 2017 WL 3994811. Assuredly, approving postpetition debt when a debtor has not demonstrated the ability to pay their prepetition debt appears nonsensical.

What is clear from the above cases is that any determination on postpetition debt is driven by the specific facts of each case. Consequently, the court will undertake a comprehensive review of the facts of an individual case and the terms of the proposed loan with an eye on the reasonableness and necessity of the postpetition debt and any impact on the confirmed plan. Additionally, this court will also consider the purposes of chapter 13, specifically the "financial rehabilitation and a fresh start for the debtor." Liberty Nat'l Bank & Tr. Co. of Louisville v. Burba (In re Burba), 1994 WL 709314, *17 (6th Cir. 1994) (unpublished) (citations omitted). It appreciates that court oversight of postpetition debt offers protection to both debtors with poor decision-making histories and prepetition creditors. In re Chaney, 308 B.R. 588, 590-91 (Bankr. N.D. Ga. 2004) (citing In re Bagby, 218 B.R. 878 (Bankr. W.D. Tenn. 1998)).

Turning to the facts of this case, Debtors are highly educated above-median debtors who have shown a proclivity for poor financial decision making. When they filed, they were underwater on their house, a car, and had a staggering amount of unsecured debt. In spite of their above-median incomes and steady employment, they had taken multiple payday loan advances

and unsecured debts totaled over $157,000 by their calculation. It all appears to arise from good old American spending, not unforeseen tragedies.[3] Yet Debtors appeared to be current on their secured debt payments on the petition date. And within the confines of their confirmed plan, they seem to be doing well. Secured creditors have not filed motions for relief from stay, suggesting Debtors remain current on secured debt payments. Debtors are current on plan payments and are paying a one hundred percent (100%) dividend to unsecured creditors.

Debtors introduced little on the actual terms of the PLUS loan, focusing mainly on the fact that it would be due after plan payments and therefore would not impact the confirmed plan. Their post-hearing brief indicates they need to borrow $15,737, less than their $18,553 PLUS loan eligibility. According to the Federal Student Aid office of the U.S. Department of Education, the interest rate on loans disbursed prior to July 1, 2018 is 7%. Federal Student Aid, an Office of the U.S. Department of Education, https://studentaid.ed.gov/sa/types/loans/plus#interest (viewed June 21, 2018). There is also a loan fee of 4.264%. Id. The term of the loan is unknown. Id. Although the loan will come due upon disbursement, Debtors requested a deferment which they understand to be nearly automatic. Document, ECF No. 52. They were recently informed that repayment of the PLUS loan would begin six months after graduation. Document, ECF No. 53. Since the loan will not be payable until after the chapter 13 plan completes, it is unlikely that estate property will be involved in repayment. There is no expectation that this loan will affect their plan payments or the prepetition creditors. When the PLUS loan comes due, Debtors should have $1,900 per month, the amount of their chapter 13 plan payment, available to pay the PLUS loan. While they may not have an entirely fresh start, upon discharge, they will have reduced their secured debts and eradicated over $150,000 in unsecured debt, accomplishing their financial rehabilitation.

The terms of the PLUS loan do not appear wholly unreasonable. The interest rate and loan fees are standardized. Debtors are borrowing less than their eligibility amount. While the loan may be due upon disbursement, Debtors are seeking a deferment and payments will not begin until after their plan completes. Although the loan does not rise to a necessity, it is unlikely to impinge on plan performance. In short, the court is not convinced that it has the authority to stop Debtor from making a very bad choice. The court will therefore grant the motion and overrule Trustee's objection.

This decision is not without reservation. The court is conscious of the pressing weight that student loan debt has in modern U.S. society. At the end of the second quarter in 2017, student loan debt totaled $1.41 trillion dollars. Federal Reserve Bank of New York Research and Statistics Group, Quarterly Report on Household Debt and Credit, May 2018.[4] People with student loan debt are less likely to own a home than their peers without student loan debt. Federal Reserve Bank of New York Center for Microeconomic Data, How Does Student Debt Impact Home Ownership Status?, https://www.newyorkfed.org/microeconomics/topics/

---

3 At a status conference on June 26, 2018, Debtors' counsel represented that Mr. Nacci may have experienced health issues a couple of years ago but this is not clearly supported in the record and there were no details about the nature or impact of the medical issue on Debtors' income or expenses.

4 The report can be found through a link on the following URL address: https://www.newyorkfed.org/microeconomics/hhdc.html (viewed June 21, 2018)

student-debt (viewed June 21, 2018). Jerome Powell, Federal Reserve Chairman, is concerned the abounding student loan debt may slow economic growth over time. Jeff Cox, Student Debt Could Hold Back Economic Growth, Should be Discharged in Bankruptcy, Fed Chief Says (March 1, 2018, 1:59 p.m.), https://www.cnbc.com/2018/03/01/student-loan-problems-could-hold-back-economic-growth-fed-chief-says.html (viewed June 21, 2018). Moreover, parents do not always weigh the impact of borrowing for their children's education against their future retirement. Jillian Berman, College Loans are making it Harder for Parents to Retire (March 9, 2017, 11:51 a.m.), https://www.marketwatch.com/story/college-loans-are-making-it-harder-for-parents-to-retire-2017-02-27 (viewed June 21, 2018). Multiple advisors do not recommend borrowing for a child's education and encourage parents to explore more affordable opportunities. Robert Farrington, Parents: Stop Taking out Loans for Your Child's College Education (July 14, 2014, 9:21 a.m.), https://www.forbes.com/sites/robertfarrington/2014/07/14/parents-stop-taking-out-loans-for-your-childs-college-education/#4a9f90b860a6 (viewed June 21, 2018)

Daughter has chosen a pricey private school, likely over more affordable options. The choice is baffling considering that she (and/or her parents) will be substantially indebted, although she could graduate from many fine institutions with no debt. These are the types of choices that cause bankruptcy or, at a minimum, materially reduced standards of living.

The court will note that it may not be as generous if the same need arises next year. And should the debt come due earlier than expected, the court is unlikely to allow Debtors to reduce plan payments to accommodate the PLUS loan payment. One brief, final expression of regret: you can borrow for your child's education, but you can't borrow for retirement.

A separate order will be entered immediately.

#    #    #

**Service List:**

Christopher Adam Nacci
Elizabeth Ann Nacci
232 Elm Drive
Wooster, OH 44691

Thomas Karl Mast
111 South Buckeye Street
Suite 240
Wooster, OH 44691

Toby L. Rosen, Trustee
400 W Tuscarawas Street
Citizens Bank Bldg. 4th Floor
Canton, OH 44702